Thank you. May it please the Court, my name is Dan Siegel. I represent Sarkis Khoury, the plaintiff and appellant in this matter. Viewed in the light most favorable to Dr. Khoury, beginning on February 20, 2009, when he spoke at a faculty meeting to indicate his strong belief that the faculty at the Anderson School should hire its first Latino, Latina faculty member in its history, there began an unbroken chain of hostility against him, which led to the filing of accusations against him by Dean Moses and Chair Smith. Those accusations were based in large part, as it subsequently came out, on an absolutely false statement, an absolutely false rendition of the comments that Dr. Khoury made. We know that to be the case because those comments were taped, and ultimately even Dean Moses was required to acknowledge that the accusations were false. Given that the jury rejected, and some of the jury verdict was valid, rejected the retaliatory investigation claim, and I take it there's no contest that Dr. Khoury did the things that were found that he did. You're not contesting that on appeal. In other words, while on sabbatical, he worked and was paid, etc. So don't you have to demonstrate then that the actual punishment was in retaliation for something? Yes, of course. So in other words, we know that he wasn't investigated in a retaliatory manner because the jury found, so found. So now we get to the issue of whether or not he was fired in a retaliatory manner. We start out with the notion that what he did was a firing offense. You're not contesting that. What he is alleged to have done was a firing offense. Well, what they found that he did. But the Privilege and Tenure Committee and the Chancellor concluded that. Right. After a hearing in which your claim on appeal is not that there was insufficient evidence for them to find that. Your claim in federal court, I'm sorry, but rather that his firing was in retaliation for his First Amendment speech. For his protected speech under Title VII, yes. So what's, don't you have to demonstrate that other people who engaged, who engaged in the kind of conduct that he engaged in didn't get fired? Judge Horowitz, I would want to distinguish in response to your question between a discrimination claim and a retaliation claim. Right. And a discrimination claim, which we do not have here and are not arguing about, it's often thought necessary to show that a similarly situated person was not treated the same way. But in a retaliation claim, that is not part of what is. But the difficulty is your client, I assume for purposes of this record, committed firing offenses. You're not claiming that these offenses are not the kind of offenses for which people are not normally fired. I would parse the two ways in which the court has constructed its question. We're not arguing on appeal that someone appropriately. Couldn't be fired for doing these things. For these kinds of things might be fired. Okay. So my problem is your unbroken chain argument. Does he then get immunity at the end of the day for things for which anybody else would be fired, simply because there's evidence at the outset that they took off after him for? And that's question one. And question two, because I want you to address them together, is given the jury finding against your client on retaliatory investigation, how do we – all the judge found that there was a question of fact on discrimination in the investigation. Once the jury finds the investigation wasn't retaliatory, how do we then have an unbroken chain of facts? That's my real question. I think, though, we cannot justify the court's decision on summary judgment by virtue of the results of the trial, which was shaped by that erroneous decision. But there was a trial limited to retaliatory investigation. And the counterclaim. Put that aside. Right. And the jury found, as a matter of fact, that there wasn't a retaliatory investigation. Exactly. So how then do we then have an unbroken chain of – I understand that maybe the judge couldn't have known that at the time that he granted summary judgment on your retaliatory firing claim. But now that you're stuck with that fact in this case, if you're stuck with that finding of fact, how do you then have an unbroken chain? My argument there, which I strongly believe is the correct argument, is that the jury should never have been faced with the scenario with which it was faced. And it's hard to second-guess the rationale for that jury decision as rejecting the idea that there was retaliation against Dr. Couric. Counsel, I gather your position is that if the termination issue – if you've been able to present the termination issue to the jury, you would have tried a very different case. So, at least from your perspective, you do not attach any particular significance to the jury finding based on a record that, from your point of view, was incomplete. Precisely, Your Honor. In fact, as the case proceeded, it seemed to me that the jury could not rule other than it did, because wouldn't it be natural for a university, when faced with accusations of misconduct, to investigate those accusations, right? And that's all the jury was asked to decide. But was there anything wrong with the university proceeding with the investigation, given the allegations, but not the facts of the underlying bias? Who engaged in the retaliatory firing, if you will? Separate investigation from firing. Who was guilty of that tort? Well, you know, ultimately, Your Honor, under the precedent decisions in Moses – excuse me, in Poland, Gilbrook, and Lakeside Scott, the party that engaged in the retaliatory termination was the University of California, right? I'm trying to deal with your modest person, in this case, if you will. It goes to the P&T committee. You're not making any claim that that committee acted in a retaliatory way, are you? No, but the claim is that the committee's activities, the hearing that it held, was entirely based upon the actions of the two biased complainants. Right. So I'm trying to move backwards in this chain and figure out what your claim is. Your claim is that we had two biased complainants that made a claim that turns out, at least for present purposes, to be true, which is that your client did some things that are a firing offense. A neutral tribunal heard that claim and made a determination that he should be fired. And so my question is, assuming those are the facts, does the retaliatory motive of the people who complained mean that he can't be disciplined for those activities? Again, Your Honor, I feel like we're starting at the wrong end of this conversation for purposes of both what occurred in this case, but also the precedential decisions of this court. The issue is whether the retaliatory animus possessed by Moses, Smith, and Stewart should be deemed to be the cause of the ultimate conclusion. Well, no, I'm asking exactly that question. They were the complainants. Okay. So, I mean, if I can make an analogy to a civil or criminal context, the KKK makes a complaint that a black professor has been stealing because they hate him. Okay. The district attorney investigates it and determines the black professor has been stealing. He brings a charge. A neutral jury finds that the black professor has been stealing and that he's punished. And so the question is, in my mind, exactly the question you're posing, how far down the line do we impose the retaliatory motives of those who complained when it turns out, even though they're bad people, what they're complaining about is true? But I appreciate the hypothetical, Your Honor, because the hypothetical you pose as applied to this case would be as though the KKK made the complaint, decided to be the prosecutor, was the prosecutor, decided which witnesses to call, called those witnesses, and presented the case to the trier of facts. But your client had the ability to present his case to the trier of facts, and you're not claiming that the trial was unfair, are you? The trial was unfair because it was permeated by the bias of the people who controlled it. Counsel, you say that there were the Moses, Smith, and Stewart. They were three of 28 witnesses who testified at the hearing. Much of that hearing, as I understand it, involved charges that were brought by, I believe, perhaps an executive chancellor, Mr. Kidder, who had no relationship to Smith and Stewart and Moses. So a good part of that hearing involved witnesses, not the three individuals that you've identified, dealing with charges that were unrelated in any way to those three individuals. So how can you make the claim that whatever bias those three individuals had so infected that process that the ultimate decision was made was tainted by them? Again, Your Honor, I want to reiterate that the issue for the court and the issue for me is whether Dr. Khoury should be allowed to try his claim, right, not whether the hearing committee, based on the case before it, made the right decision. But in direct response to your question or comment, Your Honor. Excuse me, Counsel, but it seems to me the district court was saying on those facts, some of which I've identified, many more of which the district court identified, that no reasonable jury could find that the termination decision was infected by the retaliatory animus of those three individuals. Isn't that what the district court found? The district court made that decision, and it did so in violation of this court's precedents, particularly in Poland and particularly in Lakeside, Scott, and the Supreme Court's decision in Staub, all of which hold that where there is a discriminatory process and the defendant is unable to prove, and again, Staub says the burden is on the defendant to prove that the ultimate result was not infected by the discrimination of the people who brought the charges. Now, you mentioned Kidder, and just to be particular in response to your question, Your Honor, the second complaint was brought by Moses and Kidder. The first complaint was brought by Moses and Stewart. They were not just two of the 28 witnesses. Moses testified not only of her own observations as a percipient witness, but of her investigation of these matters going back not only to the first charges, but also lacing her testimony and descriptions with matters completely outside the record to the effect that Dr. Khoury was a bad guy and had been involved in all sorts of unstated but impliedly awful behavior over the years. So, you know, again, I mean, I think the case before you is a somewhat narrow one, and is it Poland or is it Lakeside, Scott? Why isn't the Supreme Court's decision in Nassar, which indicates that in a Title VII retaliation case it's a but-for standard that applies, why isn't that the standard that should be applied here? I don't reject the idea that under the Supreme Court's decisions and under the Ninth Circuit's decisions that it is a but-for standard, that had Dr. Khoury been allowed to go to trial, he would have had to prove to the jury that he would not have been terminated but for the retaliatory animus of Stewart, Smith, and Moses. And that gets back to my original question. I understand this is not a discrimination claim, but is there any evidence in this record, because we're on summary judgment, and you're burdened to produce some, that other professors, other people who do what he did, weren't fired? In other words, it strikes me as a very—I say this as a former regent, so I've got some background in this. It's the kind of stuff for which people are fired all the time, it seems to me. So doesn't he have to demonstrate that somehow the punishment for his crimes was retaliation as opposed to simply that the prosecution of this offense was retaliation? I can answer twice to that question. Once on the record, and second, based on my own experience. My own experience tells me that the University of California fires an infinitesimal number of tenured professors every year, maybe one or two in the whole system. But secondly, more to the point because it's in the record, is that Chancellor White, who essentially made the decision here, based on the record that was presented to him, said explicitly, and that's before the court, that my decision is based on the cumulative effect of all of the charges against Dr. Khoury, not simply those that were prosecuted, Your Honor, by Mr. Kidder, but the cumulative effect of all of the charges. So I think it's reasonable to infer that from Chancellor White's point of view, had he not been convinced of the merits of all the charges, he might not have recommended termination. But weren't there two separate punishments? One was a censure and suspension. That one you're not attacking. And the second one was the termination. Wasn't it only the second one that the Chancellor upheld for purposes of this case? In other words, there were two separate charges. He dealt with each of them separately, did he not? There were two separate complaints. And I think the way Chancellor White discussed them was in the context of eight charges. And he did recite, charge by charge, what the penalty suggested by the Privilege and Tenure Committee was, and in each of the eight instances affirmed that penalty. But at the end of the day, he said it's because all of them, cumulatively, that led him to recommend termination to President. I want to be clear on the one question I asked you, because I think I know the answer, but I'm not sure you've addressed it directly. You did not proffer any evidence in the district court that this is an unusual punishment for the offenses committed. That was not an issue. And, again, we were not in the... I understand. That's the way you've answered the question several times. I just want to make sure the answer to my question is no, you didn't proffer any evidence on that. And I see that I'm running out of time and would like to reserve the minutes for the final defense. All right. Thank you very much. Ms. McDonough? May it please the Court. Sandra McDonough for Defendant Regents of the University of California. As this Court has already recognized, this case follows on a jury trial where the jury unanimously found in favor of the university as to appellant's retaliation claim. So what significance does that have? Because right before the jury trial, the judge granted summary judgment on some claims. Are you claiming that even if he erred, the jury trial cures the errors? No, Your Honor. The issue there is just that that is not on appeal, is what the jury found. So he says, look, maybe I wasn't investigated in a retaliatory manner, but I was terminated in a retaliatory manner. So I'm not sure what the jury trial does for us. Well, the jury trial just specifically looked at whether there was an adverse employment action in the investigation. And as we argued in the district court, even at the summary judgment level, an investigation is not an adverse employment action. So even if it's taken in a retaliatory manner, it doesn't give rise to a claim. Correct. All right, so it doesn't have anything to do with what's before us, does it? So what we are really looking at is the causal link, as each of you have identified, is we're looking at where does the causal link break. And in each of the cases that were cited by appellant today, Poland and in Lakeside, each of those cases, they recognized that there is a point where the causal link can be broken. And to Your Honor's point that an individual does not receive immunity simply because they believe that someone, at the beginning of a process, was retaliatory. Counsel, excuse me. Some of those cases have language which seems to me arguably favors the appellant. I believe Poland uses language such as, you know, And if the ultimate decision was influenced by or those who harbored the retaliatory animus were involved in, the ultimate decision of those who may not have harbored any retaliatory animus, that is enough for the plaintiff to meet the burden of showing that that ultimate decision was, in effect, retaliatory. I think there are two distinctions for Poland. One is that the court goes a little further and states that there must be some pervasive effect of the retaliatory people. Weren't they just describing the extent of the retaliatory animus? They weren't setting that down as a test, pervasiveness, were they? The pervasiveness really looked at how much of an influence did the retaliatory individuals have in the ultimate decision or was there some sort of independence in the decision? So why isn't that a fact issue in this case? Why hasn't Professor Corey presented enough evidence to let a finder of fact have to determine whether or not the chain was broken? Typically, in negligence cases, that's what we do when we go to a jury and we say, you know, here are the facts. You determine whether or not this was a but-for cause or whether or not it wasn't. Why isn't this a factual issue? Well, I think for the reasons identified by this panel earlier. We identified questions. Tell us what your position is. The issue is that if you look at the investigation here and then ultimately the P&T committee, they conducted an extensive investigation that did break the chain as a matter of law, and they had four days of hearing, a 93-page single-spaced report. Dr. Corey was allowed to present any evidence he wished to present. He was allowed to cross-examine the university's witnesses. And so as a matter of law, in looking at the undisputed facts, it determined that the causation link was broken there. And this is different than Poland in that, in Poland, the ultimate decision-maker really relied just extensively on the retaliatory supervisor and looked at the witnesses that only that supervisor wanted to present. So I believe there are 21 witnesses that the individual who was the alleged retaliator presented. That's who the decision-maker looked at. And the individual in Poland, the plaintiff, did not have an opportunity to present his entire case. And that's different here. What's the role of the chancellor here? The P&T committee makes a recommendation. Does the chancellor review that on the record? Does the chancellor make his own factual determinations? Is he de novo review? Is he appellate review? In this case, the chancellor did review the record and had essentially a de novo review of the entire record. And there was a sufficient record here, given that there was the 93-page report, and not just the recommendations and findings, but there were entire transcripts in this case that could be reviewed. Ms. McDonough, I was thinking about a question that I don't think you've addressed, which is the claim seems to be by Mr. Siegel that Moses and her friends had animus against Currie because Currie was in favor of an affirmative action hire. And I think your position is that that wasn't at all in the causal link of him being fired. He was fired for economic factors or economic actions that he took. Answer me this. Didn't Ms. Moses sign the complaint along with Mr. Kidder? She did, Your Honor. All right. In her role. So she had something to do with the final formulation of that complaint. Isn't that sufficient evidence to say that a reasonable trier of fact could find that her animus affected Kidder? Well, two issues on that. In the district court level, the judge did find that at least in the prima facie case there was enough temporal proximity between Ms. Moses' alleged retaliatory bias and the charge that was filed in 2010, even though there was a year difference. And I would submit that there wasn't enough of a connection, that any alleged retaliatory bias that she had from an incident that occurred in February 2009 Couldn't the argument be made that they would never have investigated his economic activities had Ms. Moses not had an animus against him because of his position on affirmative action? That is the argument that appellant makes, but I think that we can go back to the example given earlier in this court today of the district attorney. Are we to say that even though the original investigation was started by somebody that had an allegedly improper motive, that ultimately the person cannot be held responsible for acts that would lead to termination or discipline? Well, I only asked the question. I'm not sure I got an answer. So let's assume that to be the case. Let's assume we have a district attorney who prosecutes people on a racial basis and you go to trial and puts on evidence from racially biased witnesses with an ax to grind. And the trial results in a conviction or a civil liability against the defendant. No problem? Well, there I think you would look at the evidence presented. Even if the judge is fair and the jury is unbiased? No problem? Well, you would look at the evidence presented, the independent nature of the evidence presented, the independent nature of the fact finder. And so looking at what evidence was in front of the judge. And here you have an independent investigation that even the Poland court has recognized is a very important step. And if we here today say that it doesn't matter what the university does, that if you start out and there's a bad seed from the beginning, it continues all the way through, then employers won't be motivated to do independent investigations. And they serve a very important purpose. And it just can't be possible on the record before us that three faculty members, completely unrelated to this department, spent four days in hearing and who knows how many hours after that presenting this report on their own independent finding, independent faculty member, independent academic judgment on the facts of this case. And to move back to the causation link, when we go forward and we look at the evidence on the conflict of commitment issue, although Ms. Moses may have filed the initial charge, the evidence really was presented by many different people in the hearing itself about the outside business and the outside income that was unreported. Let me ask you the question I asked Mr. Siegel. And I take his point. It is almost impossible to fire a faculty member, good, bad, or indifferent. But is there anything in this record that suggests that this is the kind of thing for which people are normally fired? As Mr. Siegel indicated, evidence was not presented one way or the other as to whether this was. So his argument is, well, maybe I did this stuff, but you wouldn't have fired me, but for the fact that I'm outspoken on affirmative action. How is the court to address that in the absence of any evidence one way or the other? Actually, Your Honor, I don't know that there was a specific, as you indicated, there might be in some cases a specific similarly situated individual. But Bill Kidder, the individual who signed the charge and carried it forward, did testify in the underlying proceeding about the significance given to the conflict of commitment rules and that they are enforced not just at UC Riverside but across the system and that they do move forward on these issues. Yeah, I guess what troubles me about this case, and I'm not sure which way it pushes me, is essentially his argument is, look, I got the death penalty for something that I wouldn't have got the death penalty for, but for the fact that I'm an outspoken advocate of affirmative action. And there's some evidence that at least the process began for that reason. So why isn't that enough to get him to a jury? Well, in this case, any argument to that effect has been waived because Dr. Corey has not alleged that the punishment doesn't match the crime. No, but he's alleged that he was only punished because of retaliatory animus. Correct? That's his legal claim, yes. And so I guess if you're only punished because of retaliatory animus, the punishment never matches the crime. Well, that certainly is a way to answer your question to Mr. Siegel earlier about whether you can show if other similarly situated people were treated differently or if the punishment should match the crime. That is a portion of pretext that the plaintiff always has an opportunity and the burden shifting for retaliation to show as an element of pretext that no one else is treated this way, that the punishment was excessive, that I didn't actually do what they allege I did. Dr. Corey did not submit any evidence or any argument on that point in a summary judgment, and that would have been his opportunity to say the punishment does not match the crime. And there are many other cases that I'm sure have been before this court where such an argument is made. I didn't deserve that because I didn't do it. Or I did it, but that punishment did not match it. That argument was not made here as a matter of showing pretext. Counsel, what does the record show about the circumstances under which Mr. Kidder became aware of these possible conflicts of interest? And specifically, is there any indication that he became aware of those possible conflicts through any interaction that he had with Moses, Smith, and Stewart? He did become aware of the issues that led to the second charge, the conflict of commitment charge, as a result of investigating another issue. It's a little bit like the Lakeside-Scott case, where as they were investigating another administrative issue, these other issues came to light. What other administrative issue? Your Honor, it was somehow related, and I apologize I can't direct you to that specific fact, but it was related in some way to administration. And there is an allegation, at least in this case, and for purposes of summary judgment we did not dispute it, that there was some sort of connection between Stewart, Smith, Moses, and Dr. Kidder. Well, did that other administrative issue, was it one involving Stewart, Smith, and Moses? I believe that the allegation that was presented at summary judgment was that they were involved in some way in that other issue. And so ultimately that sparked an issue about, oh, is there something else going on here? Because as he was looking into Dr. Corey's background, he noticed that, for instance, if you did a Google search on Dr. Corey, some of these outside interests had come up. And that's how some of the outside interests came to light. Is there something akin to a fruit-of-the-poisonous-tree doctrine here? In other words, I take it Dr. Corey's real argument is, look, this all began in an illegal and malicious way, and everything else flowed from it. And I'm entitled to try to show that to a finder of fact. And you're saying as a matter of law there was a break in the chain. Right. Where did the break in the chain occur as a matter of law in your view? Well, I, of course, would argue it happened much earlier, but I think we can at least, at the very least, say that the breaking of the chain happened at the time of the P&T Committee. At the time of the? P&T Committee, the hearing. Maybe it's not a good analogy. Are the Fourth Amendment attenuation cases something we can look at for an analogy? In other words, you have some illegal action, but we essentially say, well, it would have ended up the same way anyway, inevitable discovery or something like that. But we put the burden on the state to demonstrate that. Are those an appropriate way to look at these cases? Well, even if you do apply that same standard here, the university has met its burden to show that regardless of any alleged retaliatory animus in the beginning of this process, when we get to the hearing, when we get to the P&T Committee, when we get to Dr. Corey's opportunity to present all of the evidence that presumably he would have even presented at trial should he be allowed to go forward, the three-panel hearing committee determined that he should be terminated or his tenure revoked as a result of the second charge, based on the conflict of commitment. And that's where the chain was broken. Counsel, how do you deal with Chancellor White's letter, then, based upon his review supposedly of the entire process? Isn't it a fact that he refers to the totality of the charges, the long history with Professor Corey? And he goes on to say that that history, the totality of the instances, supports the decision to terminate. Does he not? When you look at Chancellor White's letter, there are really two distinct charges here that have been combined a bit. But the charges related to, let's say, the lack of collegiality in the hiring process, the 2009 charges, he, of course, upheld the censure and suspension under those. On the second set of charges, that's where he said the totality of the circumstances. He was looking at- You think his letter sufficiently separates the second set of totalities from the first? Correct. And what part of the letter do you think does that? Well, the second charge, if you look at it, and we focus really on this conflict of commitment issue as we talk about the second charge. But if you look at it, there were other issues that were involved, specifically potential harassment of coworkers or subordinates. And so when he's looking at that totality of the circumstances, not just the conflict of commitment issue, but that circumstance and the evidence that was presented of a pattern of that type of behavior, that's what he's looking at. No, I understand your point. I guess my question is he's dealing with two sets of charges in one document. Correct. And he upholds both sets of discipline. Correct. So why is it that I think when he says on the totality of the circumstances, with respect to the second discipline, he's only referring to the allegations that are encompassed in that second charge? I think it's based on a reading of the fact that each one was delineated and that in delineating the various charges that, for instance, were from the first charge, that he did not indicate that those ones were subject to termination, but only those in the second charge. And I think you can look at it, too, that if you are just looking at, let's say, the harassment of the individuals, the alleged harassment, I don't think that the Chancellor was saying that alone would trigger taking away tenure. But then when you look at the whole circumstances, the harassment, the history, and the conflict of commitment, insofar as it relates to the second charge, because he didn't find that that was an appropriate remedy in the first charge, that that should be upheld. May I ask you a question? Mr. Siegel said that for purposes of a retaliation claim, let's say the McDonnell-Douglas discrimination analysis, which requires the plaintiff to come forward after there's a good reason for his termination with some evidence of pretext, does not apply in retaliation cases. Do you agree with him? I don't, Your Honor. And do you have a case that tells me that? Well, I believe that any of these cases here that we looked at, including the ones that the district court cited in the summary judgment opinion, would look at the fact that the McDonnell-Douglas test does apply in the retaliation context, that it's a burden shifting. And the last page, I believe, of the court's opinion in this case, the district court summary judgment opinion, looks at the fact that pretext must be shown. It's not just a prima facie case. You ultimately have to show once a legitimate nondiscriminatory business reason is put forth that ultimately there was some sort of pretext in that decision. So why didn't he have sufficient evidence of pretext by showing that the folks who instigated these charges against him were not more motivated by First Amendment bias, if you will? Well, the evidence in the district court found this, and of course I agree, is that the retaliatory animus really went to the prima facie case, that ultimately... It starts at the front end and not at the back end. Right, yeah. And that was not strong enough. What the court found here, and what should be affirmed, is that it was not strong enough evidence to carry all the way through, that there was a break. And that's why maybe on the prima facie case the court found, okay, there's enough there. But then once the university put forth its legitimate business reason, then the burden really shifted back to the plaintiff to show that there was some sort of ultimate retaliatory... I'm wondering whether in some cases, because it's different than the employment cases in the sense that in the employment cases you show you're part of a protected class, or I'm a minority, I'm a woman, in this case you've got to sort of make your prima facie case at step one, I was fired because of a bad reason. Step two, they come back and say, no, no, we had a good reason. Does the pretext notion really apply at that point, or did we just try whether it was a good reason or a bad reason? Well, the cases hold that the plaintiff can't challenge the legitimacy of the business reason, whether it was retaliatory or not, by simply disagreeing with the business judgment. Now, to be sure, but he submitted, in this case, evidence that the judge found at least sufficient at step one of the analysis to show that he was fired, that the adverse action here was taken for retaliatory reasons. And the university says, no, it wasn't. So I'm not sure why we then move on to the pretext analysis under those circumstances instead of just simply trying that issue of fact. Well, because that goes back to the burden shifting. The prima facie case, if he hadn't even put together something showing some temporal proximity or some sort of animus, we wouldn't even get to whether there was a legitimate business reason. I'm asking a different question. I want to be clear. But in a retaliation context where your prima facie case actually requires that you prove that something bad was done as opposed to just proving your status, then I'm not sure why we would then also require the person to show that the reasons given by his opponent were pretextual. That strikes me as putting a double burden on the plaintiff. Well, you know, the discrimination cases are not so dissimilar in that way, even though they typically focus on whether there is a protected status, for instance. There is a fourth element of the prima facie case in discrimination which says some other reason shows that that protected status was related to the adverse employment action. So even in the prima facie case, you have to show something that says it's related. The typical case that I think of, the typical Title VII case, it's a woman, pick a client, who says, I'm a woman, I'm over 40, and I was fired. And the court says, that's enough. Now it's your turn, employer. You tell us why. And the employer says because she was a terrible employee. And we say, okay, then you've got to come up with more plaintiff to get to a jury. But here, at the front end, he's come up with evidence of First Amendment animus, if you will. And so I'm not sure why he should have to come up with it again at the next stage. The burden is more significant evidence at a later stage. At the initial stage, you just have to set the stage that I engage in a protected activity, there's an adverse employment action, and there's some tiny connection between the two or alleged connection. And that's the temporal proximity. But ultimately, the burden does fall on the plaintiff to show that there was some sort of pretext or at least a triable issue of fact as to pretext. And Dr. Corey did not show that here. All right. Thank you very much. We've taken over your time. The case of Corey versus Regis. Do you have some rebuttal? Thank you, Your Honor. I'll be quick. I think the conversation this morning demonstrates the intense factual nature of these cases, which, of course, is what this court has said in Poland and Lakeside, Scott. And I just want to emphasize for half a second here is that those cases were resolved after trial. They came to this court after trial. And then the court had the benefit of a full record to determine whether the plaintiff had successfully shown that the biased investigator had had a sufficient impact on the ultimate result. Counsel, I think Judge Hurwitz asked you, as the argument began, about what he perceived, and I shared the view as a somewhat curious logic of your position in the sense that your argument that if this process began with the retaliatory animus of the three individuals we've identified, that gives your client a curious kind of immunity. No matter what he does, no matter what kind of charges are brought, so long as those charges are part of a process that began with charges brought by these three individuals, he is immunized from any kind of discipline. Isn't that the logic of your position? Your Honor, I would never make that argument. Aren't you, in effect, making that argument? My argument is simply this. A jury, after a full trial, should decide whether my client has proven that he would not have been terminated but for the discriminatory animus of Moses, Scott, and Stewart. And if the result of that trial is that the jury concludes that regardless of that animus, he did enough bad things to justify his firing, then they would say the firing was legitimate and we would not be making some kind of immunization argument. But the law, and I think that Judge Bay touched on this in his questions to opposing counsel, is that in this case, under the law of the Ninth Circuit, once a plaintiff raises a prima facie case, protected activity, adverse action, some connection between the two, then on summary judgment, that should be enough. And especially here, here, because we're not dealing with... Counsel, that can't be right. There is the, at least I believe, there is the burden-shifting phenomenon. There is a third step to the analysis. The court is entitled at summary judgment to consider whether, on this summary judgment record, a reasonable jury could find in the plaintiff's favor on that third step. The jury can, but the court should not on summary judgment. And I would, again, I know my time's up. I would ask the court to look especially at the cases cited on page 35 of our brief, opening brief, particularly this court's decision in Godwin, where you have direct evidence of bias, Smith saying, we need to teach these guys a lesson, and so we'll reject their opinion and hire the white applicant. That's enough. Okay. Thank you very much, Mr. Siegel. Thank you. Thank you for your argument, and we adjourn until tomorrow morning at 9 o'clock. All rise.
judges: Lipez, Bea, Hurwitz